JUDGE GOFER
delivered the opinion oe the court.
William M. Brand, by his last will and testament, published November 10, 1845, and admitted to probate in the county court of Fayette County during that year, devised to his wife, Harriet W. Brand, his house and adjacent grounds, consisting of about twenty-four acres, situated in the suburbs of Lexington ; also his household furniture, all the personal property used about the house, and his household servants, for and during her natural life or widowhood; and in case she should marry again, she was to have one third of his estate for life. He gave to his four sons each one ninth of his estate, and the remaining five ninths to his executrix and executors in trust for his five daughters. He directed that the shares of his sons should be paid to them as they respectively arrived at the age of twenty-one years, and that his daughters should receive their shares at the time of their respective marriages or when they should leave their mother. But it was provided that the shares of the children in the estate devised to the widow for life should not be allotted to them until her death. Then follows this clause:
"It is my will, and I do hereby direct, that my executrix and executors shall have the right, and I do hereby empower them, or those of them who shall qualify as such, to sell and dispose of and convey any part of my real or personal estate, and to vest the same in any other estate; and I do direct that the profits of my estate shall be left in the hands of my executrix and executors, to rear and educate my children, or so much thereof as shall be sufficient and necessary, and for the support of my wife for life, or during her widowhood; and that in distributing to my nine children, to each a ninth part, a due proportion of each ninth shall be retained out of each ninth to support my wife for life or during her widowhood, except William’s ninth, who shall have his full ninth, as he will render many services to his brothers and sisters and mother.
*85 “ If my executrix, or any of my executors, shall die, the survivor or survivors shall have full power to act as if all were living and concurring.”
The clause appointing his executrix and executors is as follows:
“ I do hereby appoint my beloved wife Harriet M. Brand executrix; my beloved and respected father John Brand, my son W. H. Brand, my brother George W. Brand, and my brother-in-law Edward MacAlister, executors of this my last will and testament; and I do direct that they shall not be required to give bond and security by the county court of Fayette County for the due execution of their duties as such, as I have the fullest confidence in their faithful discharge of their duties as executrix and executors.”
All those nominated executors qualified; but Mrs. Brand did not. "William H. Brand was, however, the sole active executor.
The homestead devised to the widow, having upon it a large and expensive house, the executors, the Avidow, and five children, then adults, and the guardians of the infants, in August, 1854, filed, in the Fayette Circuit Court, under chapter 86 of the Revised Statutes, a petition for the sale of the homestead, in which they said, that “the executors, doubting whether their general power to sell was intended to embrace the dwelling-house proper, submitted the matter to the court.”
The court decreed a sale of the homestead, and appointed the executors and Mrs. Brand “a commission to make the sale, and gave them a discretion to sell the whole or only a part.” They sold the house and twelve acres of the land for $15,000, which was paid to W. H. Brand, who, in making his settlements, mingled it with other money in his hands as executor.
At some time, but precisely when or why the record does not show, W. H. Brand ceased to act as executor, and Wm. *86 E. Burr was appointed by the county court of Fayette County administrator de bonis non, with the will annexed.
The last items of debit and of credit in W. H. Brand’s last settlement are dated March 14, 1856, and the first in that of Burr bears date December 9, 1859.
We assume therefore that Brand ceased to act, and that-Burr was appointed between those .dates.
After his appointment, Burr sold the residue of the homestead for $3,000. He made settlements in August, 1861, August, 1863, and again in April, 1866, in none of which is there any trace to be found of the particular fund arising from the sale of that part of the homestead first sold.
It appears from those settlements that Burr received the purchase money for that part of the homestead sold by him, and paid out large sums, and that there was in his hands, when he made the last settlement, the sum of $37,909.47, consisting of real estate, cash, bank-stock, and notes.
Burr having resigned his trust at or about the time of making his last settlement, Isaac W. Scott was appointed his successor, and gave bond, with the appellant as his surety, and Burr turned over to him the estate in his hands.
In December, 1872, Scott resigned, and the appellee John W. Barr was appointed and qualified as his successor.
Barr thereupon instituted this suit against Scott and the appellant, upon their bond to recover an alleged balance of $26,081.92 in the hands of Scott, as shown by his last settlement with the county court.
Scott failed to answer. Warfield set up various defenses, only a part of which are now insisted upon. The court rendered judgment in favor of Barr for the amount claimed; and from that judgment Warfield has appealed.
Taking the questions presented by appellant’s counsel in their natural order, the first to be disposed of is, whether the appellee can maintain this suit.
*87 It is insisted, upon two grounds, that he can not. The first is, that it does not appear that at the time of the appointment of Burr, or, indeed, at the time of the appointment of the appellee, the executors who qualified, or some of them, were not still in office, and therefore that it does not appear there was a vacancy; and if there was no vacancy, the appointment was void.
The second ground is, that conceding the appointments of Burr, Scott, and the appellee were valid, and that there are assets in the hands of Scott for which he and the appellant are liable on the bond, the appellee has no right to recover such assets.
The petition contains distinct allegations that Burr, Scott, and the appellee were each, in succession, appointed administrator, with the will annexed, of William M. Brand. There are no allegations of the death, resignation, or removal of the original executors, or of Burr or Scott. The only allegation as to the executors is, that they all qualified except Mrs.. Brand; that W. H. Brand was the active executor; that the executors named having died or declined to act, Burr was appointed administrator; that he afterward ceased to act, when Scott was appointed by the Fayette County Court.
We think the allegation that the county court appointed an administrator de bonis non is, prima facie, sufficient to show that there was a vacancy (Jacob’s adm’r v. L. & N. R. R. Co., 10 Bush, 263), and that the orders appointing Burr, Scott, and the appellee are valid.
But if this were otherwise, the appellant’s answer cures the defect, if any existed in the petition.
The second ground presents more difficulty.
By the rules of the common law an administrator de bonis non could only recover from his predecessor or his personal representative such of the estate of his testator or intestate as remained in specie, and could not recover the proceeds of such *88 as had been converted into money, unless such proceeds had been kept separate and were capable of identification. (Beall v. New Mexico, 16 Wallace, 541; Graves v. Downey, 3 Mon. 356; Slaughter v. Froman, 5 Mon. 20.)
And the right to recover for the assets which came to the hands of the first administrator, and were wasted by him, was in the distributees, and not in the administrator de bonis non* (Felts v. Brown, 7 J. J. Mar. 147; Lawrence v. Lawrence, Littell’s Selected Cases, 123.)
But it is contended, by the appellee, that this rule was changed by section 1 of an act approved January 21, 1856 (Rev. Stat., 1 Stanton, 514), which provided that thereafter, when any personal representative might wish to resign his trust, he should settle his accounts as such, and then apply to the court in which he qualified, and thereupon said court should accept his resignation, and order him to be removed, and appoint another in his place, to whom the court should prder the estate of the decedent to be delivered.
As already remarked, an administrator de bonis non is, by the rules of the common law, only entitled to recover from his. predecessor such estate of the decedent as remained in his-hands in specie; and this was held upon the ground that when property is lawfully disposed of by a personal representative the title passes, and whatever he receives for the property, unless kept separate and in a condition to be identified as the proceeds of the estate, becomes the property of the personal representative, and he becomes liable therefor on his bond; and the liability of the’ former personal representative is not “ estate of the decedent,” but is a chose in action belonging to those entitled to the estate as creditors, legatees, or distributees*
The statute last cited is the first in this state which authorized a personal representative to resign his trust. Provision had been made for the removal- of such fiduciaries, and for appointing administrators de bonis non, when a vacancy occurred *89 by death or removal. It is probable that in that state of the law the probate courts were not bound, if indeed they had power, to accept the resignation of an executor or administrator, and if they had not, they, of course, had no power to appoint an administrator de bonis non, except when the former incumbent was dead or had been removed. It seems to us, therefore, that the object the legislature had in view in adopting the act of 1856 was simply to provide a mode in which a personal representative might resign, and that it was not intended to introduce so great a change in the law as had been effected, if, as the counsel for appellee contend, a resigned administrator is required to account to his successor, not only for property remaining in his hands in specie, but a]so for his entire official liability. The language of the statute is, that another personal representative shall be appointed, “to whom the court shall order the estate of the decedent to be delivered.” This, when taken in its strict legal signification, means no more than if it had read, “ to whom the court shall order the estate unadministered to be delivered.”
This construction is not only warranted by the language of the statute, when taken in its well-established legal import, but is necessary to preserve the harmony of the law.
Section 19, art. 1, chap. 37, Rev. Stat. provided for the removal of a personal representative, who should reside out of the state, become insane, or otherwise unsuited to the trust, and that his co-representative, if he had one, should discharge the trust as if the one removed was dead. And sec. 21 provided, that if there was no other personal representative to discharge the trust, the court might appoint one, who should “have the same power and rights, and be liable to the same responsibility, as respects the estate unadministered, as the person removed.” It is clear that when a personal representative was removed, and an administrator de bonis non appointed, the latter was only entitled to receive the unadministered estate *90 remaining in the hands of his predecessor, and such proceeds of estate administered, i. e. converted, as could be identified as such.
And the language of sec. 21, supra, is broad enough to include, and no doubt does include, the successor of a deceased personal representative. To adopt the construction of sec. 1 of the act of 1856, contended for by the appellee, would be to leave the rights, powers, and duties of one class of administrators de bonis non, e. g. those whose predecessors have died or been removed, to be governed by one rule, and those whose predecessors have resigned, to be governed by another and different rule. We find nothing in the statute requiring such a construction; and for the reasons stated decline to adopt it.
Having reached this conclusion, we must hold that the appellee had no right to maintain an action to recover the fund sued for, unless there is something in the record to take this case out of the general rule, that an administrator de bonis non can not recover upon the liability of a former personal representative for wasting or misappropriating assets in his hands.
That the general rule does not apply, is attempted to be maintained on the ground that the will imposed upon the executors the duty to retain out of the shares of the devisees a sum sufficient to support the widow during her life or widowhood, and to pay over to her from time to time a sufficiency for that purpose, and that that duty devolved on each successive administrator de bonis non, with the will annexed, and now devolves upon the appellee, who has a x’ight to the possession of the fund to enable him to execute the will.
To this the appellant responds: (1) that the testator intended the fund directed to be retained out of each of eight ninths of his estate for the support of the widow, to be paid over to her by the executors, and thex’efore that Scott had no right to receive it from Burr, and not haying been entitled to it as administrator de bonis non, he (appellant) is not *91 liable for its misappropriation; and (2) that even though the widow was not entitled to receive the fund, and it was the duty of the executors to retain it, and pay it to her as they deemed it proper to do so for her support, that duty was not executorial, but a mere personal trust, and did not devolve on an administrator de bonis non, with the will annexed.
Whether the whole fund intended for the support of the widow should have been paid to her at once, or retained* by the executors and paid over from time to time, to meet her current wants and secure her comfort, must depend upon a correct construction of the will.
The testator gave his executrix and executors power to sell any part of his real or personal estate, and to invest the proceeds as a productive fund, and directed that the profits should be left in their hands to rear and educate his children and support his widow during her life or widowhood. But having, by other clauses, directed distribution to be made to his sons, upon their attaining their majority, and to his daughters, when they should marry or leave their mother, and as the whole estate, except that devised to her for life, might be required to be distributed before her death or marriage, to avoid the danger that she might be, in that way, deprived of a support, he directed a sum sufficient for that purpose to be retained in making distribution. He did not direct that it should be paid over to the widow, but that it should be retained out of each of the eight ninths when distribution was made. That it was his intention that his executors should retain the whole estate, and receive and apply the income to the support and education of his children and the support of his widow, until some one of his children should become entitled to demand his or her share, is plain; and it is equally plain that he intended that they should continue to hold all not required to be paid over to his children, as they respectively became entitled to their shares, until they had all received their portions. Up to that time the widow *92 and the child or children remaining with her were to be supported out of the profits of the estate; and as a fund was to be retained for her support, after all her children had received their shares, provided she did not marry, we see no reason to conclude that the testator intended that, as soon as the shares of all the children had been paid, a gross sum, in the discretion of his executors, should be paid to her for her support from that time forward. We therefore conclude that the will made it the duty of those charged with its execution to invest or retain in their hands such sum as, in their judgment, was deemed necessary for the support of the widow.
Such being the duty of the executors, did that duty devolve upon each successive administrator de bonis non?
In the consideration of this question, we omit any inquiry into the question, whether the executors or the administrators de bonis non, with the will annexed, had power to sell the homestead devised to the widow for life, and whether the fund now in the hands of Scott was made up in part of the proceeds of the sale of that property.
The record authorizes the conclusion that, as early as April, 1848, two years and a half after the probate of the will, the settlement of the estate had so far progressed as to enable the executors to determine the amount that could be distributed to each of the testator’s nine children. On the 20th of that month W. H. Brand paid to his sister Elizabeth $3,193, and in his settlement he credits himself, as of the same date, with a like sum, which we assume he intended as his own share. In April, 1853, he paid a like sum to H. H. Brand; and in July, 1855, a like sum to Harriet. In June, 1860, April, 1862, and June, 1865, Burr, as administrator, paid to Catharine M., J. W., and G. C. Brand similar amounts. We do not find any evidence in the record of the payment of the shares of Mary and Emily; but as G. C. Brand was the youngest child, and arrived at his majority on or before June 26, 1865, and nothing *93 to the contrary appears in the record, we assume that they were paid prior to that time, which was more than a year before Scott’s appointment.
And from these facts, and the further fact that from that time forward the income from the fund remaining in the hands of Burr and Scott was paid to Mrs. Brand, and that no suggestion is made that any of the children either have or assert a right to further payment out of that fund, we assume that prior to Scott’s appointment, and probably during the time W. H. Brand was controlling the estate, as executor, it was determined that the excess of the estate over $28,737— $3,193 to each of the nine children — should be set apart and held for the support of the widow.
Every thing necessary to ascertain and fix the rights of all those interested in the estate having been accomplished, all that remained to be done was to pay to the testator’s children who had not already received their shares, and to hold and apply the fund set apart for the support of the widow, and all the children having received their shares before the resignation of Burr, all that remained to be done, when Scott was appointed, was to hold and apply the fund to the widow’s support. And in order to decide whether those duties devolved upon him, and afterward on the appellee, as administrator de bonis non, with the will annexed, it is material to inquire whether they were executorial or merely trust duties.
There is much curious and intricate' learning in the books in respect to the distinction between those duties of an executor which pertain to him as executor, and those which are merely trust duties.
Independent of a statutory regulation requiring bond and surety of an executor, it would not generally be important to inquire whether the executor had acted in the particular instance as executor or as trustee, for in either case he would be liable for his default. But when required to give bond with *94 surety, the question became an important one. The liability of a surety is always to be measured by his covenant. (Grimes v. Clay, 4 Litt. 6; Oldham v. Collins, 4 J. J. Mar. 49; Neely v. Merritt, 9 Bush, 346.) And consequently the sureties of an executor can not be liable for any other breach than that of the legal duties of the executor. (Clay & Craig v. Hart, 7 Dana, 1; Speed’s ex’r v. Nelson, 8 B. Mon. 503; Neely v. Merritt, supra.)
In selling land in obedience to the mandatory directions of the testator, or in pursuance to a discretionary authority, given to the executors, they do not act in virtue of their office of executor, but as the mere donees of a power, i. e. as trustees. (Conklin v. Egerton, 21 Wendell, 436.) And it is because of this distinction that prior to the statute of 1838 (Lough-borough, 239-240) it was uniformly held by this court that the sureties of an executor were not liable on the bonds in the form then in use for the proceeds of land sold by their principal, under power given in the will. (Helm v. Darby, 3 Dana, 186; Cloudas v. Adams, 4 Dana, 603; Speed v. Nelson, supra.)
A devisor may require some act to be done in future in order to the vesting of an estate, or for the preservation or control of a fund to be applied to a designated purpose, and may, and often does, appoint some friend to receive, manage, and control money or property to be applied to specified uses. “But in this his friend does not act as executor; the law does not consider him such. His powers are regulated by distinct departments of the statute or common law — those relating to powers in trust, the due execution of which are supervised, not by the ecclesiastical tribunal (probate court), but by the courts of chancery and common law.” (Conklin v. Egerton, 21 Wend. 436.)
This distinction was very clearly stated by the Master of the Rolls in the case of Lord Brougham v. Lord William Poulett. (19 Beavan, 133.)
*95 Speaking of the offices of executor and trustee he said: “Their characters are frequently, as they'are in this will, united in the same person, but they are themselves distinct, and the executorial character, which begins at the death of the testator, may merge into the character of trustee, which begins at a later period, and for the most part when the executorial duties relative to the trust fund have ceased. . .
For the most part, executorial' duties consist in ascertaining the proper net amount of the various parts of the testator’s property after payment of debts and expenses, and distributing them among the persons entitled; these persons may be trustees, who hold it in trust for others, and they themselves may be and often are the trustees, who receive and retain, as trustees, the fund ascertained by themselves as executors.”
And in the case of Phillips v. Manning (2 Myl. & Cr. 309) Lord Cottenham recognized the same principle, and held that an executor who had paid the other legatees and set apart £400, bequeathed to him upon certain trusts, held that sum from that time forward as trustee, and not as executor, saying that when the executor severed the legacy from the general personal estate he could not pay it over to any other person; he was bound, by the direction of the testator, to hold it upon certain trusts, and what he would have done by paying it to a trustee, he has done by severing it from the testator’s property, and appropriating it to the particular purposes pointed out by the will, and that it was impossible to consider that the executor, so acting, was. acting as executor; he had all the while been acting as a trustee.
The principle of these cases was recognized by this court in Jennings v. Davis (5 Dana, 130), is indorsed as correct by Hill in his work on trustees (*364), and we entertain no doubt of its soundness. When therefore the fund now in contest was set apart for the support of the widow, which was certainly before Scott’s appointment, the duties of the execu *96 tors or administrator de bonis non, as such, ceased as to it, and it became a trust fund, and was thereafter held by whoever had control of it, not as executor or administrator de bonis non, with the will annexed,.but as trustee; and no other executorial duties with respect to that fund remaining to be performed, Scott, as administrator de bonis non, with the will annexed, had no legal right to receive it, and the appellant, as his surety, is not liable unless Scott was entitled to the fund under the provisions of sec. 13, art. 1, chap. 37 of the Revised Statutes, which provides that “ an administrator with the will annexed, shall possess and exercise all power and authority, and shall have the same rights and interest, and be responsible in like manner as the executors therein named or any of them.”
That section was substantially the same as the first section of the act of 1810 (M. & B. 671); but neither has, to our knowledge, been construed by this court except as to the powers of administrators, with the will annexed, to sell land directed by the will to be sold, or which the executors had a discretionary power to sell.
In Jackson v. Jeffries (1 Mar. 89), the court held that an administrator with the will annexed had, under the act of 1810, power to sell lands which the executors were authorized to sell, but whether the power amounted to a direction to sell or was merely discretionary, does not appear. In Brown v. Hobson (3 Mar. 380), it was held that a discretionary power to executors to sell could not be executed by an administrator with the will annexed, but neither the statute nor the case of Jackson v. Jeffries was referred to.
In an unpublished opinion (Smith v. Heywood, Winter Term, 1869,) and in Shields v. Smith (8 Bush, 604), it was held that an administrator de bonis non, could lawfully sell land which the executors had a discretionary power to sell, and the doctrine of the case of Smith v. Heywood was recognized as correct in Gulley v. Prather (7 Bush, 168).
*97 But in all those cases, except the first two, the sale of the land was necessary for the settlement and distribution of the respective estates, and we think, in view of the act of 1838, (Loughborough, 239, 240) and of act of 1810, continued in force in sec. 13, art. 1, chap. 37, Revised Statutes, and in sec. 13, art. 1, chap. 39 of the General Statutes, such duties are now to be regarded as executorial, and therefore proper to be exercised by administrators with the will annexed.
The case of Clay & Craig v. Hart (7 Dana, 1), in which it was held, that the sureties of an executor were not liable to devisees for the proceeds of land devised to them, but which the executors had a discretionary power to sell, was decided June 16,1838, but of course under the law as it existed prior to February of that year. Although that case merely followed, with more elaboration and detail of argument and illustration, several cases previously decided (Helm v. Darby, 3 Dana, 186; Cloudas v. Adams, 4 Dana, 603), its discussion at the bar very probably called the attention of the legislature to the defect in the law on that subject, and an act was passed and approved on the 16th day of February, 1838, requiring that thereafter the bonds of executors and administrators, with the will annexed, should contain, in addition to the conditions theretofore prescribed by law, a further condition that the executor or administrator with the will annexed, as the case might be, would well and truly pay and deliver' over all goods, chattels, moneys, or other property which should come to his hands as executor or administrator, as aforesaid, to such persons as should be entitled to the same by law or the provisions of the will; and that he would faithfully perform and execute all trusts and powers with which he ivas invested by the provisions of the will. That act continued in force until superseded by the Revised Statutes in 1852, when some changes were made in the covenants required of executors and administrators with the will annexed.
*98 The bond there prescribed omitted, among other things, the covenant to faithfully perform and execute all trusts and powers created or conferred by the will, but contained a covenant to well and truly administer, according to law, the proceeds of the sale of any estate which the will empowered him to sell, thereby securing the proceeds of land sold by an executor or administrator with the will annexed.
The provisions of these statutes respecting executorial bonds seem to us to indicate an intention on the part of the legislature to extend the limits of strictly executorial powers and duties; and we think we ought, in furtherance of that intention, to treat all those powers and duties conferred and imposed by the will, the faithful exercise and performance of which are secured by the executorial bond, and which pertain to the settlement of the estate and the ascertainment of the net amount and its distribution, according to the usual course of administration, among those entitled to it, as legal executorial powers and duties, and all others as trusts. By such a construction we avoid complications, and establish a standard which, though it may not conform to the doctrines of the common law, will have the greater merit of uniformity and simplicity.
There may be other powers and duties besides those above enumerated which, under the rules of the common law, were regarded as trusts not pertaining to the office of executor, which, under the statute, would devolve on an administrator with the will annexed; and we are not certain that any general rule applicable to all cases can be safely laid down. But we think we hazard nothing in saying, that when the faithful exercise of the power or performance of the duty is not secured by the form of bond prescribed by the statute, and the power or duty does not relate to the settlement of the estate and its distribution according to the ordinary course of administration, and especially when the estate, after being otherwise ready for distribution to those in interest, is required by the *99 will to be held in the hands of the executors, upon trusts which may extend over a long period, and from their character must be presumed to have been made by the .testator because of his personal confidence in the fitness of his executors for the discharge of the duties imposed, such power or duty will not pass, under the statute, to an administrator de bonis non, with the will annexed. In such a case application should be made to the chancellor for the appointment of a trustee to execute the trust.
The statute was, no doubt, enacted solely to facilitate the settlement of estates, and we are unwilling to believe that the legislature intended to go beyond what was necessary for that purpose, and to confide to administrators de bonis non those delicate and responsible trusts which testators sometimes confide to their chosen executors. Powers are sometimes confided to executors, or, more properly, to the person filling the office of executor, as a trustee, which are so delicate, and of such a nature, that even the chancellor can not execute them. Yet if the construction contended for by the appellee be adopted, the legislature has, by a dogmatic statute, conferred power for that purpose upon an administrator with the will annexed.
Brand, by his will, nominated as his executors, his father, his brother, a son, a brother-in-law, and his wife, and authorized them to sell any part of his large estate, and to invest the proceeds so as to yield an income, which was to be expended, at their discretion, in rearing and educating his children, all of whom were then under twenty-one years of age, and five of whom were daughters. He also gave them the right to determine the amount to be retained for the support of his widow. He expressed the utmost confidence in them; they were of his own, or his wife’s immediate family, and his great confidence in them, no doubt, had much weight in shaping his will.
Had he supposed the execution of these powers would de *100 volve upon an administrator to be selected by the county court, and who would, after his appointment, act independently of that court, apd all others, so long as he was not guilty of such an abuse of the trust as would authorize his removal, we can not, for a moment, entertain the belief that he would have made such a will as that before us.
It may be suggested that, no matter what construction may be given to the statute, in the event which has happened — the resignation, removal, or refusal of the nominated executors to execute the trusts — they were, of necessity, to be executed by some one not nominated by the testator. This is true. But if the chancellor had been applied to for the appointment of a trustee, that trustee would have been required to execute the trusts under the supervision of the court, which could, at all times, have been applied to by the trustee, or eestui que trust, for advice, direction, and control, in the mode and manner of executing the trust.
The Supreme Court of Judicature of New York, in construing a statute very similar to ours, held, in an elaborate and well-considered opinion, that an administrator de bonis non could not execute a discretionary power of sale given by the will to the executors nominated therein (Conklin v. Egerton, 21 Wend. 432); and although this court has not recognized the authority of that case in the point in judgment there, the reasoning of the opinion sustains the view we have taken in this case, and is an authority to support our refusal to give that enlarged construction contended for by the appellee.
We therefore hold that the fund now sued for was ascertained and set apart for the support of Mrs. Brand before Scott was appointed administrator de bonis non, and that, from the time it was so ascertained, it became a trust fund, and was held by those having control of it as trustees, and not as executor or administrator with the will annexed, and that under the statute the right and duty to hold it did not devolve on *101 Scott or on the appellee, and therefore that the appellee can not maintain an action to recover it.
Judgment reversed, and cause remanded with directions to dismiss the petition.